# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FLORIDA CHEMICAL COMPANY, LLC, | ) | |
| and ARCHER-DANIELS-MIDLAND | ) | |
| COMPANY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0288-JTL |
| | ) | |
| FLOTEK INDUSTRIES, INC., and | ) | |
| FLOTEK CHEMISTRY, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Date Submitted: July 21, 2021
Date Decided: August 17, 2021

Kevin R. Shannon, Christopher N. Kelly, Daniel M. Rusk, IV, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William C. O'Neil, Joanna R. Travalini, Adam J. Smith, WINSTON & STRAWN LLP, Chicago, Illinois; *Counsel for Plaintiffs.*

A. Thompson Bayliss, J. Peter Shindel, Adam K. Schulman, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Layne E. Kruse, Joy Soloway, Kelly Potter, NORTON ROSE FULBRIGHT US LLP, Houston, Texas; *Counsel for Defendants.*

**LASTER, V.C.**

Under a stock purchase agreement, a buyer contracted with a parent corporation to acquire a wholly owned subsidiary (the "Company"). In accordance with the stock purchase agreement, the seller caused the Company to enter into a supply agreement with another of the seller's wholly owned subsidiaries. The stock purchase agreement attached a form of the supply agreement as an exhibit and required that the seller furnish an executed copy of the supply agreement at closing. The supply agreement ensured that after the sale, there would be an ongoing contractual relationship between the Company as supplier (owned after the sale by the buyer) and the seller's wholly owned subsidiary as customer (still owned after the sale by the seller).

The stock purchase agreement contained a forum selection provision that encompassed all claims arising out of or relating to the stock purchase agreement and related transaction documents, including the supply agreement. The provision requires that those claims be litigated in a court located in the State of Delaware. The supply agreement did not contain a forum selection provision.

The seller signed the stock purchase agreement that contains the forum selection provision. The seller did not sign the supply agreement. The seller's subsidiary signed the supply agreement. The seller's subsidiary did not sign the stock purchase agreement.

When disputes arose over the supply agreement, the seller and its subsidiary filed a lawsuit in Texas state court. They asserted a range of claims against the buyer and the Company, including causes of action for breach of the supply agreement and for tortious interference with the supply agreement. As a remedy, they sought rescission of the supply agreement.

The buyer and the Company responded by filing this action. At this stage of the case, they seek an anti-suit injunction barring the seller and its subsidiary from pursuing their claims in the Texas lawsuit. The plaintiffs ask the court to apply the forum selection provision in the stock purchase agreement to the claims implicating the supply agreement. They also ask the court to enforce the provision not only against the seller that signed the stock purchase agreement, but also against its non-signatory subsidiary.

This decision grants the request for an anti-suit injunction against the seller. The analysis is straightforward. The plain language of the forum selection provision encompasses claims that arise out of or relate to the supply agreement. The seller chose to bind itself to that provision, and the court will enforce the seller's commitment.

This decision also grants the request for an anti-suit injunction against the non-signatory subsidiary. The analysis is more complex.

In a line of decisions traceable to *Capital Group Cos., Inc. v. Armour*, 2004 WL 2521295 (Del. Ch. Nov. 3, 2004), Delaware courts have held that a forum selection provision can be enforced against a non-signatory under principles of estoppel.

Equitable estoppel supports enforcement of a forum selection provision against a non-signatory if the non-signatory accepted a direct benefit under the agreement. The doctrine of equitable estoppel prevents the non-signatory from accepting the benefits of the agreement without also accepting its burdens, including the forum selection provision.

Promissory estoppel supports enforcement of a forum selection provision against a non-signatory if a signatory to the agreement controls the non-signatory, and if the circumstances surrounding the transaction evidence a promise by the signatory to litigate

2

in a particular forum on behalf of itself and its non-signatory affiliate. The doctrine of promissory estoppel bars the signatory controller from promising to concentrate all litigation that falls within the provision in a single forum, then using the non-signatory affiliate to evade that promise.

So far, so good. But in elliptical language, the *Capital Group* decision examined whether the claims against the non-signatory arose from the non-signatory's "standing relating to" the agreement containing the forum selection provision. In the section of the decision that contains that language, the court seems merely to have evaluated whether the claims at issue fell within the forum selection provision in the pertinent agreement. Subsequent cases, however, have interpreted that step in the court's reasoning as establishing an additional element that must be met before a forum selection provision can bind a non-signatory. Under that line of cases, the agreement that contains the forum selection provision must give rise to the claim by or against the non-signatory. This decision refers to that interpretation as the "same-agreement rule."

The same-agreement rule first appeared in dictum. The decision that expressed the dictum did not have to reach that element of the *Capital Group* test, because the parties stipulated that it was met. Moreover, the facts of the case likely would not have supported a strict application of the same-agreement rule. And despite articulating the same-agreement rule, the court framed its analysis broadly and relied on explicitly policy-based reasoning, suggesting that the court still would have enforced the forum selection provision against the non-signatory even without the parties' stipulation. The same-agreement rule thus rests on a questionable foundation.

A more serious problem is that the same-agreement rule limits the scope of the forum selection provision that otherwise binds the non-signatory. If a forum selection provision sweeps more broadly than claims arising under the agreement containing the provision (as forum selection provisions often do), then the same-agreement rule overwrites the provision to reach only those claims arising under the agreement containing the provision. That result conflicts with both estoppel-based paths to enforcement. When equitable estoppel provides the basis for enforcing the provision against the non-signatory, the same-agreement rule enables the non-signatory to accept the benefits of the agreement while only being bound by a subset of the burdens. When promissory estoppel provides the basis for enforcing the provision against the non-signatory, the same-agreement rule enables the controller to promise that it will litigate in a particular jurisdiction to the full extent of the forum selection provision, then evade its promise for any claim that does not satisfy the same-agreement rule.

This decision therefore declines to apply the same-agreement rule. After determining that the other elements of the *Capital Group* test are met, it asks only whether the claims at issue fall within the scope of the forum selection provision.

In this case, the seller promised under the plain language of the forum selection provision in the stock purchase agreement to litigate all claims arising out of or relating to the supply agreement in Delaware. The seller entered into the supply agreement through a controlled affiliate. For the seller's commitment to be meaningful, the seller's promise had to encompass claims by or against the non-signatory affiliate that arise out of or relate to

4

the supply agreement. The forum selection provision therefore binds the non-signatory affiliate.

Applying the same-agreement rule would conflict with the plain language of the forum selection provision and enable the seller to evade its promise. And the resulting jurisdictional scheme is not one that parties logically would craft. The provision would bind the seller to sue the buyer in Delaware for tortious interference with the supply agreement (because the seller signed the stock purchase agreement and is bound to the full extent of the provision). Yet the provision would not require the subsidiary that is a party to the supply agreement to sue in Delaware for breach of the supply agreement or to seek rescission of the agreement (because the same-agreement rule would limit the scope of the provision for the subsidiary to claims arising under the stock purchase agreement). Instead of fulfilling the seller's promise to centralize litigation in a single forum, the forum selection provision would promote the balkanization of litigation.

The parties agree that the forum selection provision is valid and enforceable. This decision holds that it can be enforced against the seller's wholly owned subsidiary under principles of estoppel. Having reached those predicate holdings, this decision enforces the plain language of the forum selection provision, resulting in the issuance of an anti-suit injunction against the controlled affiliate that tracks the injunction against its parent.

## I.       FACTUAL BACKGROUND

The facts come from the pleadings and the parties' submissions in connection with the plaintiffs' motion for an anti-suit injunction. What follows are not formal factual

5

findings, but rather the facts that appear reasonably likely to be found after trial, based on the current record.

**A.     ADM Purchases The Company.**

Plaintiff Florida Chemical Company, LLC is a Delaware limited liability company that manufactures citrus products for use in the flavor and fragrance market, including citrus oils, terpene, citrus flavors, and isolates. In the parlance of this decision, it is the "Company." Under a Share Purchase Agreement dated as of January 10, 2019, plaintiff Archer-Daniels-Midland Company ("ADM") agreed to acquire all of the outstanding membership interests in the Company. *See* Dkt. 1 Ex. A (the "Purchase Agreement" or "SPA").

The seller under the Purchase Agreement was defendant Flotek Industries, Inc. ("Flotek Parent"). The Purchase Agreement contemplated that between signing and closing, Flotek Parent would cause the Company to enter into a supply agreement with another wholly owned subsidiary of Flotek Parent, defendant Flotek Chemistry, LLC ("Flotek Sub"). Under the supply agreement, the Company agreed to sell to Flotek Sub— and Flotek Sub agreed to purchase—a minimum quantity of terpene each year. *Id.* Ex. B (the "Terpene Agreement," the "Terpene Supply Agreement," or the "TSA").

Two provisions in the Purchase Agreement memorialized Flotek Parent's obligation to cause the Company and Flotek Sub to enter into the Terpene Agreement. The Purchase Agreement contained a covenant which provided that "[a]t the Closing, the Company will enter into . . . a supply agreement with Flotek [Sub]," which the Purchase Agreement defined as the "Terpene Supply Agreement." SPA § 5.14. The Purchase Agreement also

6

identified the closing deliverables that Flotek Parent had to furnish to ADM, which included a "counterpart[] of the Terpene Supply Agreement . . . duly executed by Flotek [Sub] and the Company." *Id.* § 1.6(b)(viii). The Purchase Agreement conditioned ADM's obligation to close on compliance with those covenants. *Id.* § 6.2(b). Put differently, ADM did not have to close if Flotek Parent did not first cause the Company and Flotek Sub to enter into the Terpene Agreement and then deliver an executed copy of the Terpene Agreement at closing.

The Terpene Agreement was a take-or-pay contract, meaning that Flotek Sub was required to pay for the annual minimum amount of terpene whether it needed the terpene or not. The Terpene Agreement used a cost-plus pricing mechanism under which Flotek Sub was obligated to pay the Company for the cost of the Company's raw materials plus $0.45 per pound of terpene. TSA § 1. The Terpene Agreement obligated the Company to, "[w]ithin fifteen (15) days of the end of each calendar quarter[,] . . . provide to Flotek [Sub] a written report providing reasonable detail regarding the cost" of the terpene it sold to Flotek Sub. *Id.* § 5(b). The Terpene Agreement gave Flotek Sub the right to inspect the Company's terpene production facility "at any time," and to "audit the books and records" of the Company. *Id.* § 8.

The Purchase Agreement attached an unsigned and substantially final version of the Terpene Agreement as an exhibit. Between the signing of the Purchase Agreement and the closing of the transaction, Flotek Parent caused Flotek Sub and the Company to execute the Terpene Agreement. The same executive signed the Terpene Agreement for both entities. *See* Dkt. 7, Ex. B at 8. The executed Terpene Agreement was substantively

7

identical to the version attached to the Purchase Agreement; the only change inserted the parties' addresses in the notice provision. *See* Dkt. 25 Ex. E.

Flotek Sub was a party to the Terpene Agreement; Flotek Parent was not. Conversely, Flotek Sub was not a party to the Purchase Agreement; Flotek Parent was.

The Purchase Agreement contained a forum selection provision which made courts located in the State of Delaware the exclusive forum for any dispute arising out of or relating to the Purchase Agreement and other related agreements, including the Terpene Agreement. SPA § 9.8 (the "Delaware Forum Provision"). The Terpene Agreement did not contain a forum selection provision.

The parties completed the sale of the Company on February 28, 2019 (the "Transaction"). At closing, Flotek Parent delivered an executed copy of the Terpene Agreement. After closing, the Company continued as a wholly owned subsidiary of ADM. Flotek Sub remained a wholly owned subsidiary of Flotek Parent.

## B.     The Parties Renegotiate The Terpene Agreement.

In February 2020, Flotek Parent informed the Company that Flotek Sub no longer would purchase the minimum amount of terpene specified in the Terpene Agreement. Flotek Parent cited a downturn in the oil and gas end market as the basis for its decision.

To resolve the resulting dispute, the parties negotiated an amendment to the Terpene Agreement. Dkt. 18 Ex. 1-D (the "Amended Terpene Agreement"). The amendment reduced Flotek Sub's annual minimum purchase requirements. *Id.* § 1(a). The amendment also replaced the cost-plus methodology with a fixed price of $1.50 per pound. *Id.* In exchange for those concessions, Flotek Sub agreed to make a one-time payment of $15.75

8

million to the Company. *Id.* § 2. Flotek Sub also agreed to "order Terpene Product on a monthly basis, at the same or similar volume every month, to ensure that the Minimum Quantity is met and evenly distributed in every Year of the Term." *Id.* § 1(c). The Amended Terpene Agreement stated that "[e]xcept as provided herein, all other terms and conditions of the Agreement remain unchanged and in full force and effect." *Id.* § 4.

## C.    The Texas Lawsuit

In late 2020, Flotek Parent informed the Company that Flotek Sub no longer would honor its purchase obligations under the Amended Terpene Agreement. On February 2, 2021, the Company sent Flotek Sub a written notice of material breach and demanded that Flotek Sub cure within thirty days. Flotek Sub ignored the demand.

On March 26, 2021, Flotek Parent and Flotek Sub filed a lawsuit in the District Court of Harris County, Texas. Dkt. 1 Ex. E (the "Texas Lawsuit"). They named as defendants the Company, ADM, and Joshua Snively, the President of the Company. Before the Transaction, Snively was a senior executive of Flotek Parent who oversaw the Company's operations. Snively was the lead negotiator for the Terpene Agreement.

The petition in the Texas Lawsuit focused on Snively's alleged wrongdoing during the negotiation of the Terpene Agreement. The petition alleged that Snively gave ADM a "one-sided deal" because ADM was "dangling a high-paying new job offer in front of Snively." *Id.* ¶ 20. The petition alleged that by providing favorable terms to ADM, Snively was able "to go over to ADM, his new employer, with a massive contract in hand for the business he was going to run." *Id.* ¶ 30.

9

The petition also alleged that Snively deceived his superiors. Snively allegedly represented that the minimum purchase requirement was reasonable, when in reality "Flotek's internal projections . . . projected far less use of terpene even under aggressive assumptions." *Id.* ¶ 27. Snively also allegedly represented that the Company's "oilfield-related products would remain with Flotek, such that ADM would not be permitted to sell terpene for oilfield solvent applications." *Id.* ¶ 28. Instead, Snively "gave that market away to ADM." *Id.* ¶ 29.

The petition further asserted that the Company had not complied with the Terpene Agreement. It alleged that the Company failed to provide quarterly written reports documenting the cost of the terpene that the Company sold to Flotek Sub. And it alleged that ADM and the Company "refused to allow Flotek to exercise its inspection and audit rights, despite repeated demands by Flotek for an inspection or audit." *Id.* ¶ 22.

The petition in the Texas Lawsuit asserted nine causes of action. The causes of action do not differentiate between Flotek Parent and Flotek Sub.

- The first cause of action asserted that Snively breached his fiduciary duties to "Flotek" by advising "Flotek's" board of directors to enter into the Terpene Agreement "for a minimum quantity of terpene Snively knew Flotek could not use." *Id.* ¶¶ 40–43; *see id.* ¶¶ 24, 26–28.

- The second cause of action asserted that Snively breached the provision in his employment agreement that obligated him to "devote his reasonable best efforts and his full business time and attention" to promote the business of "Flotek." *Id.* ¶¶ 44–50 (internal quotation marks omitted).

- The third cause of action asserted that ADM tortiously interfered with Snively's employment agreement by offering him employment at the Company after the Transaction in exchange for Snively negotiating the "one-sided" Terpene Agreement. *Id.* ¶¶ 51–59.

10

- The fourth cause of action asserted that ADM aided and abetted Snively's breaches of his fiduciary duties. *Id.* ¶¶ 60–64.

- The fifth cause of action asserted that ADM and the Company breached the Terpene Agreement by failing to permit "Flotek" to inspect the Company's terpene facility and audit its books and records. *Id.* ¶¶ 65–70.

- The sixth cause of action asserted that Snively acted negligently when negotiating the Terpene Agreement by "forcing Flotek to unnecessarily commit to an excessive, multimillion pound amount of an expensive product annually for five years," which Snively "knew . . . would result in extreme harm to Flotek." *Id.* ¶¶ 71–74.

- The seventh cause of action asserted that ADM and Snively violated Section 31.04 of the Texas Penal Code, which prohibits the "theft of services." *Id.* ¶¶ 75–77. According to the petition, Snively was really working for ADM when negotiating the Terpene Agreement, meaning that "Flotek was deceived into paying for services that were not provided and for which Snively and ADM should not have been paid." *Id.* ¶ 76.

- The eighth cause of action asserted that ADM, the Company, and Snively engaged in a civil conspiracy to trick "Flotek" into executing the Terpene Agreement, necessitating "rescission of the Terpene Agreement and exemplary damages." *Id.* ¶¶ 78–84.

- The ninth cause of action sought alternative declaratory judgments regarding the Terpene Agreement. It asked the court to declare that the Terpene Agreement either is void, has been terminated, or is unenforceable. *Id.* ¶¶ 85–86.

## D. The Delaware Action

ADM and the Company filed this action on April 5, 2021. The complaint names Flotek Parent and Flotek Sub as defendants. Snively is not a party to this case.

The complaint asserts claims for breach of the Purchase Agreement and the Terpene Agreement. The complaint also asserts claims under a second supply agreement, but those claims are not relevant to the current motion.

As an initial litigation salvo, ADM and the Company moved for an anti-suit injunction barring the defendants "from proceeding with any claims against ADM or [the

11

Company] in the Texas Lawsuit that arise out of or relate to the Terpene Supply Agreement in violation of the [Delaware Forum Provision]." Dkt. 1 at 21. They contend that all of the claims asserted against them in the Texas Lawsuit arise out of or relate to the Terpene Agreement.

ADM and the Company do not seek to enjoin Flotek Parent or Flotek Sub from pursuing their claims in the Texas Lawsuit against Snively. Snively's employment agreement with Flotek Parent contained a forum selection provision that required that any dispute "arising out of or based on" his employment agreement be brought in Houston, Texas. Dkt. 18, Ex. 1-A § 12. Of passing interest, Snively's employment agreement also contained a mandatory arbitration provision. *Id.* § 13. A dispute exists in the Texas Lawsuit over whether the claims against Snively must be arbitrated. The plaintiffs are not seeking an anti-suit injunction that would cover the claims against Snively, so the potential arbitrability of those claims has no bearing on the issues addressed in this decision.

## II.  LEGAL ANALYSIS

To obtain a preliminary injunction, the plaintiffs must demonstrate (i) a reasonable probability of success on the merits; (ii) that they will suffer irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986). The parties agree that the only issue is whether the Delaware Forum Provision

12

governs the claims that Flotek Parent and Flotek Sub have asserted in the Texas Lawsuit.[1]

If it does, then the injunction will issue. If it does not, then the injunction will be denied.

Assessing the implications of the Delaware Forum Provision involves two separate inquiries, one for Flotek Parent and one for Flotek Sub. The Delaware Forum Provision appears in the Purchase Agreement, and Flotek Parent is a party to that agreement. The central question for determining whether an injunction should issue against Flotek Parent is whether the scope of the Delaware Forum Provision encompasses the claims that Flotek Parent has asserted in the Texas Lawsuit.

Flotek Sub is not a party to the Purchase Agreement. That fact triggers an additional, threshold inquiry: Does the Delaware Forum Provision in the Purchase Agreement bind Flotek Sub? If it does, then the court must analyze whether the scope of the Delaware Forum Provision encompasses the claims that Flotek Sub has asserted in the Texas Lawsuit.

---

[1] Dkt. 29 at 4 (counsel for plaintiffs stating during oral argument that "[a]lthough the parties disagree on several issues, their submissions made clear that this motion involves what we believe is a rather discrete question of contract interpretation. Specifically, does the [Delaware Forum Provision] cover claims relating to the terpene supply agreement?"); *id.* at 31 (counsel for defendants stating that "[w]e agree with the plaintiffs that this is a narrow issue that can be decided by the application of well-established law to largely, if not entirely, undisputed facts"); *see also* Dkt. 18 at 50–51 & n.29 (defendants devoting a single paragraph in their reply brief to the elements of irreparable harm and balancing of the equities and resting on whether the Delaware Forum Provision applies).

## A. Flotek Parent

Determining whether to issue an anti-suit injunction against Flotek Parent turns on whether the claims that Flotek Parent has asserted in the Texas Lawsuit against ADM and the Company fall within the scope of the Delaware Forum Provision. Some do. Others do not.

### 1. The Plain Meaning Of The Forum Selection Provision

The Delaware Forum Provision appears in the Purchase Agreement, but Flotek Parent's claims in the Texas Lawsuit implicate the Terpene Agreement. Whether the Delaware Forum Provision extends to claims that implicate the Terpene Agreement depends on the plain language of the provision.

The forum selection provision in the Purchase Agreement appears in a contract governed by Delaware law, so Delaware's principles of contract interpretation apply. When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorist Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). By contrast, a contract is unambiguous when "the plain, common, and ordinary meaning of the words lends itself to only one reasonable

14

interpretation." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc*, 616 A.2d at 1196.

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). A reading of an agreement must be reasonable when the contract is "read in full and situated in the commercial context between the parties." *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017). "The basic business relationship between [the] parties must be understood to give sensible life to any contract." *Id.* at 926. But this principle cannot be used to override the plain language of the agreement: "While [our courts] have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement." *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (footnote omitted) (quoting *Chi. Bridge*, 166 A.3d at 926–27). "[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not." *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

The Delaware Forum Provision states:

> Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts of the State of Delaware located in the County of New Castle, or of the United States of America sitting in the District of Delaware, and any appellate court from any thereof, in any Proceeding arising out of or relating to this

15

Agreement or any other Transaction Document or any agreements contemplated hereby or thereby for any reason other than the failure to serve process in accordance with this Section 9.8, and irrevocably waive the defense of an inconvenient forum or an improper venue to the maintenance of any such Proceeding.

SPA § 9.8.

The plain language of the Delaware Forum Provision encompasses "any Proceeding arising out of or relating to [1] this Agreement or [2] any other Transaction Document or [3] any agreements contemplated hereby or thereby." *Id.* (enumeration added).

By encompassing "any Proceeding arising out of or relating to . . . any other Transaction Document," the plain language of the Delaware Forum Provision reaches claims arising out of or relating to the Terpene Agreement. The Purchase Agreement defines the term "Transaction Documents" as "this Agreement, the Transition Services Agreement, the Escrow Agreement, the Terpene Supply Agreement, the Citrusburst Supply Agreement, and the other written ancillary agreements, documents, instruments and certificates executed under or in connection with this Agreement." *Id.* § 10.1. The Delaware Forum Provision thus explicitly extends to claims arising out of or relating to the Terpene Agreement.

By further encompassing "any Proceeding arising out of or relating to . . . any agreements contemplated hereby or thereby," the Delaware Forum Provision again reaches claims under the Terpene Agreement. This aspect of the Delaware Forum Provision is redundant, because the definition of "Transaction Documents" already includes "the other written ancillary agreements, documents, instruments and certificates executed under or in connection with this Agreement." *Id.* Nevertheless, the Terpene Agreement indisputably is

16

an agreement "contemplated" by the Purchase Agreement, which attached a substantively final version of the Terpene Agreement as an exhibit, obligated Flotek Parent to cause the Company and Flotek Sub to enter into the Terpene Agreement, and required Flotek Parent to deliver an executed copy of the Terpene Agreement at closing.

### 2. The Terpene Integration Clause

To reach the opposite conclusion, Flotek Parent relies on an integration clause in the Terpene Agreement and contends that it supersedes the Delaware Forum Provision in the Purchase Agreement. The integration clause in the Terpene Agreement states: "This Agreement and the other agreements referred to herein set forth the entire understanding of the parties hereto relating to the subject matter hereof and thereof and supersede all prior agreements and understandings among or between any of the parties relating to the subject matter hereof and thereof." TSA § 32 (the "Terpene Integration Clause").

The Terpene Agreement does not contain a forum selection provision, and the Terpene Agreement does not refer to the Purchase Agreement. Read literally, the Terpene Integration Clause would eliminate the Delaware Forum Provision. Such a literal reading is not tenable.

The Purchase Agreement and the Terpene Agreement are contemporaneous contracts and accordingly must be read together. As a matter of black letter law, "all writings that are part of the same transaction are interpreted together." *Restatement (Second) of Contracts* § 202(2). Delaware follows this principle and holds that, as a general rule, "contemporaneous contracts between the same parties concerning the same subject

17

matter should be read together as one contract." *Comerica Bank v. Glob. Payments Direct*, 2014 WL 3567610, at *7 (Del. Ch. July 21, 2014) (collecting authorities).

Viewed realistically as part of the real-world business context, the Purchase Agreement and the Terpene Agreement were executed together to effectuate the Transaction. The Purchase Agreement contained a covenant that required that Flotek Parent cause the Company and Flotek Sub to enter into the Terpene Agreement and made the Terpene Agreement a closing deliverable. An unsigned version of the Terpene Agreement in substantially final form was an exhibit to the Purchase Agreement. Between signing and closing, the only change to the Terpene Agreement was to add addresses in the notice provision. Dkt. 25 Ex. E. At closing, Flotek Parent delivered an executed copy of the Terpene Agreement, and the Transaction closed. The two contracts are properly read as a single agreement.

The Purchase Agreement contains an integration clause which confirms that the Purchase Agreement and the Terpene Agreement should be read together as a unitary contractual scheme. The integration clause in the Purchase Agreement states:

> This Agreement (including the Exhibits and Schedules hereto), the Confidentiality Agreement and the other Transaction Documents . . . constitute the entire agreement among the Parties with respect to the subject matter hereof and thereof and supersede other prior agreements and understandings both written and oral among the Parties with respect to the subject matter hereof and thereof . . . .

SPA § 9.2 (the "Integration Clause"). The Purchase Agreement defines "Agreement" to mean "this Agreement, including . . . any Exhibits and Schedules attached hereto." *Id.* § 10.1. The Terpene Agreement appeared as Exhibit B to the Purchase Agreement. *See id.* §

18

5.14, Ex. B. The plain language of the Integration Clause thus makes the Terpene Agreement part of the Purchase Agreement. *See Weygandt v. Weco, LLC*, 2009 WL 1351808, at *2 (Del. Ch. May 14, 2009) ("The Lease Agreement was one of the defined 'Transaction Documents,' and thus constituted part of the entire agreement . . . ." (alteration and internal quotation marks omitted)).

The plain language of the Delaware Forum Provision in the Purchase Agreement thus binds Flotek Parent as a signatory and extends to any claims that Flotek Parent might bring under the Terpene Agreement. The Terpene Integration Clause does not change that result. *See CA, Inc. v. Ingres Corp.* (*Ingres Trial*), 2009 WL 4575009, at *48 (Del. Ch. Dec. 7, 2009), (holding that a forum selection provision in the more "fundamental" agreement applied to an ancillary agreement that did not contain a forum selection provision, despite an integration clause in the ancillary agreement), *aff'd*, 8 A.3d 1143 (Del. 2010).

### 3.    Claim-By-Claim Analysis

The next step is to determine which of Flotek Parent's claims in the Texas Lawsuit fall within the scope of the Delaware Forum Provision. The inquiry requires a claim-by-claim analysis.

The Delaware Forum Provision applies to claims "arising out of or relating to" the Terpene Agreement. Black's Law Dictionary defines "arise" to mean "[t]o originate; to stem (from)." *Arise*, Black's Law Dictionary (11th ed. 2019). "[W]here parties to a contract animate their forum selection clause with 'arising out of' language, as long as the claims 'stem from the contractual relationship,' then 'an action need not allege contract-based

19

claims in order for the forum selection clause in the contract to be enforced.'" *SPay, Inc. v. Stack Media Inc.*, 2021 WL 1109181, at \*3 (Del. Ch. Mar. 23, 2021) (alterations omitted) (quoting *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 220 (3d Cir. 2015)). For a claim to "stem from the contractual relationship," it must be "based on the rights and obligations created by the underlying agreement." *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 151 (Del. 2002). When a claim is based on duties that exist independently of the agreement containing the forum selection provision, "the analysis must turn on the issue of whether the . . . claim[] would be assertable" in the absence of the agreement. *Id.* at 157.

The phrase "relating to" is broader than the phrase "arising out of." Black's Law Dictionary defines "relating to" to mean "to have some relation to" or "to have bearing or concern [on]; [to] pertain." *Relating to*, Black's Law Dictionary (5th ed. 1979). "[O]ur courts have considered the connector 'relating to' to be 'paradigmatically broad.'"[2] Compared to the phrase "arising out of," "[t]he term 'related to' is typically defined more

---

[2] *Pharm. Prod. Dev. Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at \*5 (Del. Ch. Feb. 16, 2011) (quoting *Lillis v. AT & T Corp.*, 904 A.2d 325, 331 (Del. Ch. 2006)); *see Delucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at \*10 n.34 (Del. Ch. Jan. 23, 2006) (describing the "broad scope" created by the phrase "relating to"); *Town of Smyrna v. Kent Cty. Levy Ct.*, 2004 WL 2671745, at \*2 (Del. Ch. Nov. 9, 2004) ("[T]here is no question that the arbitration clause found in the Agreement is broad, as it covers all claims 'arising out of' or 'related to' the Agreement."); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("The ordinary meaning of ['relating to'] is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,'—and the words thus express a broad . . . purpose." (citation omitted) (quoting Black's Law Dictionary, *supra*)).

20

broadly and is not necessarily tied to the concept of a causal connection. Webster's Dictionary defines 'related' simply as 'connected by reason of an established or discoverable relation.'" *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) (quoting Webster's (Third) New International Dictionary 1916 (1986)). The use of the phrase "related to" thus expands the scope of the Delaware Forum Provision *beyond* the universe of claims "based on the rights and obligations created by the underlying agreement." *Parfi*, 817 A.2d at 151; *see Abry P'rs, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1047 (Del. Ch. 2006) (holding that the phrase "relating to" caused a choice-of-law provision to govern not only "contract claims that might arise among the parties," but also "claims in tort seeking rescission" of the agreement). A provision that extends to matters "relating to" an agreement encompasses "any issues that '*touch on* contract rights or contract performance.'" *ASDC Hldgs., LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.*, 2011 WL 4552508, at *5 (Del. Ch. Sept. 14, 2011) (quoting *Parfi*, 817 A.2d at 155).

### a. The Claims Against Snively

In the first, second, and sixth causes of action in the Texas Lawsuit, Flotek Parent and Flotek Sub asserted the following claims against Snively:

- The first cause of action asserts a claim against Snively for breaching his fiduciary duties when negotiating the Terpene Agreement.

- The second cause of action asserts a claim against Snively for breaching his employment agreement when negotiating the Terpene Agreement.

- The sixth cause of action asserts a claim against Snively for acting negligently when negotiating the Terpene Agreement.

21

ADM and the Company do not assert that the Delaware Forum Provision applies to these claims, and they do not seek an anti-suit injunction to prevent Flotek Parent or Flotek Sub from asserting these claims.

As a segue into the analysis of the other claims in the Texas Lawsuit, it is helpful to consider which Texas plaintiff has asserted these causes of action. The petition in the Texas Lawsuit does not specify whether a particular cause of action is asserted by Flotek Parent or Flotek Sub. It nevertheless is possible to infer who could bring the claim from the legal relationships involved:

- Flotek Parent is the logical plaintiff for the first cause of action, because Snively was an employee and executive of Flotek Parent and would have owed fiduciary duties to Flotek Parent in that capacity. There is no indication that Snively was an employee (or officer or director) of Flotek Sub.

- Flotek Parent is the logical party to have asserted the second cause of action, because it is the counterparty under Snively's employment agreement and therefore would have standing to sue for breach.

- Either Flotek Parent or Flotek Sub could be a logical plaintiff for the sixth cause of action, which asserts a claim against Snively for acting negligently. That claim invokes Snively's common law duty to "exercise reasonable care to make his acts safe for others." *Restatement (Second) of Torts* § 4 cmt. b. Either Flotek Parent or Flotek Sub could have been injured by Snively and have standing to bring such a claim.

Again, ADM and the Company are not seeking an anti-suit injunction addressing these claims, but they are seeking to enjoin related claims.

b.     The Claims That Arise Out Of The Terpene Agreement

The fifth, eighth, and ninth causes of action in the Texas Lawsuit arise out of the Terpene Agreement. These claims fall within the Delaware Forum Provision.

22

The fifth cause of action in the Texas Lawsuit asserts a claim for breach of the Terpene Agreement against the Company. The petition maintains that ADM and the Company breached the Terpene Agreement by failing to permit Flotek Sub to inspect the Company's terpene facility and audit its books and records. The petition does not state whether Flotek Parent or Flotek Sub has asserted this claim, but presumably it is Flotek Sub. As a general matter, only a party to a contract has standing to enforce it, so Flotek Sub should be the plaintiff. Likewise, only a party to a contract has contractual obligations under the contract, so only the Company should be a defendant. Setting those issues aside, the claim plainly arises out of the Terpene Agreement. To the extent that Flotek Parent asserts the fifth cause of action in the Texas Lawsuit, the Delaware Forum Provision mandates that Flotek Parent bring that claim in Delaware.

The eighth cause of action in the Texas Lawsuit asserts a claim for civil conspiracy against ADM, the Company, and Snively, contending that they conspired to negotiate the Terpene Agreement to benefit themselves and harm Flotek Parent and Flotek Sub. As a remedy, this cause of action seeks rescission of the Terpene Agreement. Once again, the petition in the Texas Lawsuit does not state whether Flotek Parent or Flotek Sub has asserted this claim, but it again seems likely that only Flotek Sub, as a party to the Terpene Agreement, would have standing to assert it. Regardless, the claim arises out of the Terpene Agreement. Analytically, it resembles a claim for fraudulent inducement in that it asserts that ADM, the Company, and Snively conspired to induce Flotek Sub to enter into the Terpene Agreement. This court has held that a claim for fraudulent inducement arises out of the contract that the plaintiff was fraudulently induced to execute, bringing the claim

23

within the scope of the forum selection provision in the agreement.[3] The same is true for the conspiracy claim. Accordingly, to the extent that Flotek Parent asserts the eighth cause of action in the Texas Lawsuit, the Delaware Forum Provision mandates that Flotek Parent bring that claim in Delaware.

The ninth cause of action in the Texas Lawsuit seeks declaratory judgments regarding the Terpene Agreement. That cause of action advances three theories in the alternative. The first theory asserts that the Terpene Agreement is "void due to Defendants' wrongful conduct." Dkt. 1, Ex. E ¶ 86. The second theory asserts that the Terpene Agreement "has been terminated," meaning that "Flotek does not owe [the Company] any monies." *Id.* The third theory asserts that the Terpene Agreement is "not enforceable during a global epidemic . . . under principles of force majeure." *Id.* Yet again, the petition in the Texas Lawsuit does not state whether Flotek Parent or Flotek Sub has asserted this claim, but once again, the logical party is Flotek Sub because that entity was a party to the Terpene Agreement. Nevertheless, the claim plainly arises out of the Terpene Agreement. To the

---

[3] *See Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1226 (Del. Ch. 2001) ("The first phrase of the clause, which requires arbitration of claims 'arising out of' the Agreement, would seem to cover direct claims for breach of the Agreement or fraud in the inducement."), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002); *see SPay*, 2021 WL 1109181, at *3 ("While a fraud claim was not directly before the court in *Parfi*, the [trial] court's observation regarding the connection between a fraudulent inducement claim and the contract the plaintiff alleges he was induced to enter stands out as entirely logical and consistent with the elements of a fraudulent inducement claim. . . . [D]etrimental reliance in the context of an inducement to enter into a contract necessarily presupposes that a contract exists; if there is no contract, then there is no reliance/inducement and likely no resulting harm." (footnotes and internal quotation marks omitted)).

extent that Flotek Parent asserts the ninth cause of action in the Texas Lawsuit, the Delaware Forum Provision mandates that Flotek Parent bring that claim in Delaware.

### c. The Claims That Relate To The Terpene Agreement

Two other claims in the Texas Lawsuit do not arise under the Terpene Agreement, but do relate to that agreement. The Delaware Forum Provision applies to these claims.

The third cause of action in the Texas Lawsuit asserts a claim against ADM for tortious interference with Snively's employment agreement. True to form, the petition in the Texas Lawsuit does not state whether Flotek Parent or Flotek Sub has asserted this claim, but only a party to the contract should be able to assert that another party interfered with its contractual rights. Flotek Parent was the counterparty under Snively's employment agreement. Presumably, therefore, Flotek Parent brought this claim and not Flotek Sub.

Under Texas law, "[t]he elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss." *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998). Based on these elements, the claim for tortious interference does not arise under the Terpene Agreement. The contract at the heart of the claim for tortious interference is Snively's employment agreement, not the Terpene Agreement. The source of ADM's obligation not to interfere with Snively's employment agreement also does not arise under or relate to the Terpene Agreement; it arises under the "general [common law] duty not to interfere intentionally with another's reasonable business expectancies of trade with third persons." *Restatement (Second) of*

25

*Torts* § 766 cmt. b. The "arising under" language in the Delaware Forum Provision does not extend to this claim.

The claim for tortious interference nevertheless relates to the Terpene Agreement to a sufficient degree to fall within the Delaware Forum Provision. The negotiations over the Terpene Agreement provide the factual backdrop for the claim. Whether Snively breached his obligations depends in large part on the terms of the Terpene Agreement and whether they disproportionately benefited the Company and harmed Flotek Sub. The damages that Flotek Sub has identified specifically in the Texas Lawsuit relate to the Terpene Agreement. The *ad damnum* request states:

> [D]amages include, but are not limited to: (a) the cost of excess terpene that Flotek was forced to buy and could not sell or otherwise use; (b) the cost of storage of the excess terpene; and (c) the $15.75 million dollars Flotek was required to pay to ADM in order for ADM to agree to any amendments to the [Terpene Agreement].

Dkt. 1, Ex. E ¶ 59. In addition, the claim for tortious interference seeks rescission of the Terpene Agreement. *Id.* A claim that seeks rescission of an agreement relates to that agreement. *See Abry*, 891 A.2d at 1047 (holding that choice-of-law provision employing "relating to" language extended to claims seeking rescission of the agreement).

An obvious practical difficulty is that the claim for tortious interference with Snively's employment agreement depends on Flotek Parent establishing a breach of Snively's employment agreement. The latter claim is not subject to the Delaware Forum Provision. It is neither efficient nor desirable to litigate Flotek Parent's claim for breach of the employment agreement against Snively in one forum while litigating Flotek Parent's claim for tortious interference with Snively's employment agreement against ADM in a

26

different forum. Nevertheless, that is what the Delaware Forum Provision requires. The risk of wasting judicial resources can be addressed by staying the secondary claim for tortious interference against ADM pending adjudication of the primary claim for breach of the employment agreement against Snively.[4]

The fourth cause of action in the Texas Lawsuit asserts a claim against ADM for aiding and abetting Snively's breaches of his fiduciary duties. To the extent that the fiduciary duty claim rests on Snively's duties as an employee, then presumably Flotek Parent asserted this claim. To the extent the fiduciary duty claim rests on Snively's status as an officer or director, then the corporate entity where he served in those capacities would be the proper entity to assert it. Again, there is no indication that Snively was an employee, officer, or director of Flotek Sub.

For purposes of the Delaware Forum Provision, the analysis of the fourth cause of action parallels the analysis of the cause of action for tortious interference with Snively's employment agreement. The claim against ADM for aiding and abetting Snively's breaches of fiduciary duty does not arise under the Terpene Agreement, but it relates

---

[4] Attentive readers will note that competing forum selection provisions in the Purchase Agreement and Snively's employment agreement generate a result for claims arising under those agreements that this court construes the Delaware Forum Provision to avoid for purposes of the Purchase Agreement and Terpene Agreement. The disconnect between the Purchase Agreement and Snively's employment agreement is unfortunate but understandable: The agreements were entered into at different times and involve different subjects. The Purchase Agreement and the Terpene Agreement were part of the same overarching transaction. It is not reasonable to interpret the Delaware Forum Provision as creating a similarly problematic jurisdictional framework.

27

sufficiently to the Terpene Agreement to fall within the scope of the Delaware Forum Provision. *See ASDC Hldgs.*, 2011 WL 4552508, at *8 (noting that although defendant's fiduciary duties arose under common law, the facts giving rise to the claim "relate[d] to" the agreements covered by a forum selection provision). The cause of action also seeks rescission of the Terpene Agreement as a remedy, which plainly relates to the agreement. Dkt. 1, Ex. E ¶ 64. The Delaware Forum Provision mandates that Flotek Parent bring the claim for aiding and abetting in this court.

As with the cause of action for tortious interference, the cause of action for aiding and abetting raises inefficiencies, because the underlying cause of action for breach of fiduciary duty will go forward in Texas. To promote judicial efficiency, the potential for wasted resources can be addressed by staying the secondary claim for aiding and abetting against ADM pending adjudication of the primary claim for breach of fiduciary duty against Snively.

### d.    The Unrelated Claim

A final claim does not arise under or relate to the Terpene Agreement. The seventh cause of action in the Texas Lawsuit asserts a claim against Snively and ADM for theft of services under the Texas Theft Liability Act, 6 Tex. Civ. Prac. & Rem. Code Ch. 134 (1989) (the "Theft Act"). This cause of action maintains that because Snively was really working for ADM when negotiating the Terpene Agreement, "Flotek was deceived into paying for services that were not provided and for which Snively and ADM should not have been paid." Dkt. 1, Ex. E ¶ 76. It is again unclear which Flotek entity has asserted this

28

claim, but because Snively was an employee of Flotek Parent, presumably Flotek Parent maintains that its services were stolen.

Section 31.04 of the Texas Penal Code states:

(a) A person commits theft of service if, with intent to avoid payment for service that the actor knows is provided only for compensation:

(1) the actor intentionally or knowingly secures performance of the service by deception, threat, or false token;

(2) having control over the disposition of services of another to which the actor is not entitled, the actor intentionally or knowingly diverts the other's services to the actor's own benefit or to the benefit of another not entitled to the services;

(3) having control of personal property under a written rental agreement, the actor holds the property beyond the expiration of the rental period without the effective consent of the owner of the property, thereby depriving the owner of the property of its use in further rentals; or

(4) the actor intentionally or knowingly secures the performance of the service by agreeing to provide compensation and, after the service is rendered, fails to make full payment after receiving notice demanding payment.

Tex. Penal Code § 31.04 (2019).

The petition in the Texas Lawsuit asserts a claim under Section 31.04 (the "Theft-of-Services Claim"). The petition, however, provides little detail about the claim. The petition asserts only that "Snively owed Flotek faithful service," that "[t]hrough the conduct of ADM and Snively, the expected faithful service was stolen from Flotek," and that "Flotek was deceived into paying for services that were not provided and for which Snively and ADM should not have been paid." *See* Dkt. 1, Ex. E ¶ 76. As best the court can tell, Flotek Parent is attempting to assert that ADM had "control over the disposition

29

of [Snively's] services" for purposes of Section 31.04(a)(2) and diverted them to its own benefit during the negotiations over the Terpene Agreement.

For purposes of the Delaware Forum Provision, the Theft-of-Services Claim resembles the claims for tortious interference and aiding and abetting, but is one further step removed. Like those claims, the Theft-of-Services Claim does not arise under the Terpene Agreement. The Theft-of-Services Claim plainly arises under a Texas statute. But also like those other claims, the Theft-of-Services Claim relates to the Terpene Agreement. The negotiations over the Terpene Agreement provide the factual basis for the claim, and whether ADM "stole" services from Flotek Parent depends on whether the Terpene Agreement disproportionately favored the Company rather than Flotek Sub.

A critical difference between the claims for tortious interference and aiding and abetting, on the one hand, and the Theft-of-Services Claim, on the other, is the remedy sought. The Theft-of-Services Claim seeks damages under the Theft Act, which makes "[a] person who commits theft . . . liable for the damages resulting from the theft." 6 Tex. Civ. Prac. & Rem. Code § 134.003. For purposes of ADM's alleged theft of Snively's services, the statute would seem to call for a remedy tied to the value of Snively's services, rather than a damages award based on the Terpene Agreement. It also seems unlikely that Flotek would seek (much less obtain) rescission of the Terpene Agreement as the remedy for ADM's theft of Snively's services.

Bringing the Theft-of-Services Claim within the scope of the Delaware Forum Provision is one step too far. Considerations of comity also support this conclusion. A Texas court is far better equipped than this court to adjudicate a claim under a Texas statue,

30

and the Theft Act expresses a preference that "[a] suit under this chapter may be brought in the county where the theft occurred or in the county where the defendant resides." *Id.* § 134.004. The Delaware Forum Provision does not apply to the Theft-of-Services Claim.

**B.     Flotek Sub**

Because Flotek Sub is not a party to the agreement that contains the Delaware Forum Provision, a threshold question arises as to whether the Delaware Forum Provision binds Flotek Sub. The plaintiffs advance two rationales for binding Flotek Sub.

First, they argue that the Purchase Agreement and the Terpene Agreement must be treated as a single agreement, resulting in the Delaware Forum Provision in the Purchase Agreement binding the parties to the Terpene Agreement. That theory is contrary to precedent and fails.

Second, they argue that the Delaware Forum Provision binds Flotek Sub under principles of estoppel. That theory succeeds.

Having answered the threshold question, the court's next task is to determine which claims are covered by the provision. The Delaware Forum Provision applies equally to Flotek Parent and Flotek Sub, and the two entities have asserted the same claims in the Texas Lawsuit. Consequently, the outcome of the analysis is the same for both entities.

**1.     The Single-Agreement Theory**

ADM and the Company first contend that the Purchase Agreement and the Terpene Agreement must be read together as a single agreement, causing the Delaware Forum Provision to bind the parties to both agreements. In making this argument, ADM and the Company go beyond asserting that the two agreements should be read consistently. They

31

maintain that the Delaware Forum Provision should be treated as if it were a term that appears in the Terpene Agreement, thereby binding Flotek Sub. Dkt. 7 at 12.

It is true that, for the reasons discussed previously, the Purchase Agreement and the Terpene Agreement must be read consistently. The court applied that principle when evaluating whether the Delaware Forum Provision extended to the claims that Flotek Parent asserted in the Texas Lawsuit. Flotek Parent is a party to the Purchase Agreement and indisputably is bound by the Delaware Forum Provision. Consequently, when determining whether the Delaware Forum Provision applies to claims that Flotek Parent might assert that arise out of or relate to the Terpene Agreement, the court read the two agreements as a whole.

The same reasoning does not apply to Flotek Sub's claims under the Terpene Agreement. The instructive precedent is *Weygandt*, in which the buyer purchased a repair business from the seller under an asset purchase agreement. 2009 WL 1351808, at *1. The purchase agreement contemplated that the buyer would execute a lease agreement (the "Lease") with a controlled affiliate of the seller (the "Landlord"), and the purchase agreement conditioned both sides' obligation to close on the execution of the Lease. *Id.* The Landlord did not sign the purchase agreement. When disputes arose between the buyer and seller, the seller sued the buyer in Delaware. The buyer asserted counterclaims against the seller and a third party claim against the Landlord. To obtain jurisdiction over the Landlord, the buyer argued that the Landlord was bound by a forum selection provision in the purchase agreement. As one basis for binding the Landlord, despite the Landlord's failure to sign the purchase agreement, the buyer invoked "the general rule that agreements

32

that are part of the same transaction are construed together." *Id.* at *3. The court rejected the "proposition that, under the single agreement theory, a party can be bound to terms not contained in any document the party executed." *Id.* at *4. Elaborating, the court explained that adopting the single-agreement theory would "conflict with Delaware's general policy of not extending the rights and obligations of contracts to parties that did not execute them, absent special circumstances." *Id.*

In this case, Flotek Sub is not a party to the Purchase Agreement, and the Terpene Agreement does not contain a forum selection provision. By asking the court to read the two agreements as one, ADM and the Company seek to collapse the distinctions between the two agreements. The single-agreement theory cannot achieve that result.

### 2. The *Capital Group* Test

Alternatively, ADM and the Company argue that the Delaware Forum Provision binds Flotek Sub under a line of precedent traceable to the *Capital Group* decision. That line of authority holds that a court can enforce a forum selection provision against a non-signatory if the following three elements are met: (i) the agreement contains a valid forum selection provision; (ii) the non-signatory has a sufficiently close relationship to the agreement, either as an intended third-party beneficiary under the agreement or under principles of estoppel, and (iii) the claim potentially subject to the forum selection provision arises from the non-signatory's standing relating to the agreement. *Cap. Gp.*, 2004 WL 2521295, at *5; *see Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019) (explicating test).

33

The parties agree that the Delaware Forum Provision meets the first element of the test. The parties dispute the second and third elements. Both are satisfied, resulting in the provision binding Flotek Sub.

### 3. The Second Element

Under the second element of the *Capital Group* test, a forum selection provision can bind a non-signatory that has a sufficiently close relationship to the agreement, either as an intended third-party beneficiary under the agreement or based on principles of estoppel. The plaintiffs do not argue that Flotek Sub was an intended third-party beneficiary of the Purchase Agreement, so this decision only considers principles of estoppel.[5]

Under principles of estoppel, a forum selection provision can bind the non-signatory if (i) the non-signatory accepted a direct benefit from the agreement or (ii) the non-signatory had a close relationship to the agreement, a signatory to the agreement controlled the non-signatory, and the circumstances establish that the signatory agreed to the forum selection provision on behalf of its controlled affiliate. *See Sustainability P'rs LLC v.*

---

[5] As an aside, the decisions that rely on a non-signatory's status as a third-party beneficiary are really applying a species of equitable estoppel. Those decisions reason that a party cannot invoke the benefits of an agreement by asserting its standing as a third-party beneficiary, then attempt to avoid the burdens associated with the agreement, such as a forum selection provision. *See Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202-03 (3d Cir. 1983), *overruled on other grounds by Lauro Lines v. Chasser*, 490 U.S. 495 (1989); *Hadley v. Shaffer*, 2003 WL 21960406, *4 (D. Del. Aug. 12, 2003).

*Jacobs*, 2020 WL 3119034, at *6 (Del. Ch. June 11, 2020). The two tests are disjunctive. *Neurvana*, 2019 WL 4464268, at *1.

The direct-benefit test rests on principles of equitable estoppel. It prevents a party from accepting the benefits of an agreement without accepting all of its burdens, such as the obligation to comply with a forum selection provision. *See id.* at *3.

The foreseeability test introduces a measure of promissory estoppel. It rests on the principle that a party can promise to litigate in a particular forum on behalf of itself and a controlled affiliate. Having induced its counterparties to rely on that promise, the party cannot later renege on its promise by using a controlled affiliate to escape the forum selection provision. *See id.* at *5.

### a.     The Direct-Benefit Test

The direct-benefit prong of the second element of the *Capital Group* test reflects the principle that "[i]n general, a non-signatory is estopped from refusing to comply with a forum selection clause when she receives a 'direct benefit' from a contract containing a forum selection clause." *Cap. Gp.*, 2004 WL 2521295, at *6. The direct benefit may arise at the time of contracting, or a party may accept the benefits of an agreement after it was executed. *See id.* at *6 n.40. In the latter circumstances, "an estoppel may arise in light of the knowing acceptance of the benefits of the contract." *Jacobs*, 2020 WL 3119034, at *6.

"Delaware courts have deemed both pecuniary and non-pecuniary benefits sufficient to satisfy the test." *Neurvana*, 2019 WL 4464268, at *4 (collecting cases). The benefits must be direct; "indirect benefits have been deemed insufficient." *Id.* And they

35

must actually be received; "the mere 'contemplation' of a benefit does not directly confer one." *Id.*

Flotek Sub benefited directly from the Purchase Agreement, because the Purchase Agreement led to the execution of the Terpene Agreement. Once Flotek Parent sold the Company to ADM, Flotek Sub would need a source of terpene. The Terpene Agreement provided Flotek Sub with a source, conferring a direct benefit.

Flotek Sub knowingly accepted those benefits when it purchased terpene under the Terpene Agreement. The doctrine of equitable estoppel prevents a party who knowingly accepts a benefit from "embracing the contract, and then turning [its] back on the portions of the contract, such as a forum selection clause, that [it] finds distasteful." *Id.* at *3 (internal quotation marks omitted). Flotek Sub accepted a benefit of the Purchase Agreement by entering into the Terpene Agreement. Flotek Sub then received the benefit of that agreement by purchasing terpene from the Company. After later repudiating the Terpene Agreement, Flotek Sub embraced it again by entering into the Amended Terpene Agreement. Flotek Sub cannot now avoid the burdens that accompanied those benefits.

This court's reasoning in *Weygandt* supports this result. The Lease in that case was only needed "if the sale of the business closed." *Weygandt*, 2009 WL 1351808, at *1. The *Weygandt* court held that the Lease provided "a direct benefit to" the non-signatory Landlord and was "a benefit that [the buyer] only agreed to provide because the Asset Purchase Agreement required [it]." *Id.* In this case, the Company and Flotek Sub only needed a contractual relationship if the Transaction closed. Otherwise, Flotek Parent would have continued to own both the Company and Flotek Sub and could direct the Company to

36

sell terpene to Flotek Sub. The Terpene Agreement existed and benefited Flotek Sub because the Purchase Agreement required it.

Flotek Sub has argued that it did not receive a benefit from the Terpene Agreement because the contract was skewed in ADM's favor. According to Flotek Sub, the Terpene Agreement provided the Company with a stream of revenue, but only burdened Flotek Sub with a contractual take-or-pay commitment at a cost-plus price. Dkt. 18 at 42 n.25. It is true that the Terpene Agreement provided the Company with a stream of revenue, but it also provided Flotek Sub with a source of terpene. That is sufficient to meet the direct-benefit test. The law does not require a weighing of the relative benefits before binding a non-signatory to a forum selection provision under principles of equitable estoppel. Flotek Sub entered into the Terpene Agreement, knowingly accepted the benefits of that agreement by purchasing terpene from the Company, then again knowingly accepted its benefits by entering into the Amended Terpene Agreement and making further purchases. The direct-benefit test is satisfied.

### b. The Foreseeability Test

The foreseeability prong of the second element of the *Capital Group* test applies when the circumstances surrounding the transaction make it clear that the parties expected the forum selection provision to bind the non-signatory. Delaware courts apply the foreseeability test cautiously. *Neurvana*, 2019 WL 4464268, at *6. One scenario where it applies is when a signatory to an agreement controls a non-signatory that is closely related to the transaction. "[W]hen a control person agrees to a forum, it is foreseeable that the

37

entities controlled by that person which are involved in the deal will also be bound to that forum." *Weygandt*, 2009 WL 1351808, at *5. The foreseeability inquiry

> recognizes that parties to agreements do not always think about having controlled entities sign on to a deal, or they do not take the time to have them do so, because it is readily apparent that the controller is acting on behalf of the entities on his side of the deal.

*iModules Software, Inc. v. Essenza Software, Inc.*, 2017 WL 6596880, at *4 (Del. Ch. Dec. 22, 2017) (ORDER). By binding controlled affiliates, the foreseeability inquiry "promote[s] stable and dependable trade relations" by preventing the entities through which one of the parties chooses to act from escaping the forum selection provision. *Weygandt*, 2009 WL 1351808, at *5 (internal quotation marks omitted). The foreseeability inquiry thus forecloses "an 'end-run around an otherwise enforceable forum selection provision.'" *Neurvana*, 2019 WL 4464268, at *5 (alterations omitted) (quoting *Ashall Homes Ltd. v. ROK Ent. Gp. Inc.*, 992 A.2d 1239, 1248 (Del. Ch. 2010)).

The foreseeability test does not extend to all non-signatories that a signatory happens to control. *Id.* at *6. It only extends to controlled non-signatories with "a clear and significant connection to the subject matter of the agreement." *Id.* (internal quotation marks omitted).

In this case, it was foreseeable that the Delaware Forum Provision would bind Flotek Sub. Flotek Parent controlled Flotek Sub as its wholly owned subsidiary. Flotek Sub had a clear and significant relationship to the Purchase Agreement because it was the entity through which Flotek Parent carried out one of its contractual obligations. The Purchase Agreement attached a substantively final version of the Terpene Agreement as an exhibit,

it contained a covenant that required Flotek Parent to cause Flotek Sub to enter into the Terpene Agreement, and it obligated Flotek Parent to deliver an executed version of the Terpene Agreement at closing. When Flotek Parent bound itself to the Delaware Forum Provision for any claim arising out of or relating to the Terpene Agreement, Flotek Parent made that promise on behalf of itself and Flotek Sub.

There are also other textual signals in the Purchase Agreement which indicate that Flotek Parent sought to bind controlled subsidiaries like Flotek Sub. As discussed previously, the Integration Clause defined the parties' "entire agreement" to include the exhibits to the Purchase Agreement and "the other Transaction Documents." SPA § 9.2. The Terpene Agreement was both an exhibit to the Purchase Agreement and a "Transaction Document." The Delaware Forum Provision encompasses claims arising out of or relating to the Terpene Agreement, and the Terpene Agreement itself did not contain a forum selection provision. The logical inference is that the parties expected the Delaware Forum Provision to bind Flotek Sub.[6]

---

[6] Although this decision does not rely on this language, the Delaware Forum Provision also contains another textual signal that the parties intended to bind Flotek Sub. In the Delaware Forum Provision, Flotek Parent submitted to the exclusive jurisdiction of the Delaware courts "for itself and its property." SPA § 9.8. That is odd language, and the parties debate its meaning. One reasonable reading of the provision is that it would extend to Flotek Parent's ownership interests in subsidiaries, including wholly owned subsidiaries like Flotek Sub. Under Oklahoma law, which governs the internal affairs of Flotek Sub, the member interests in Flotek Sub are personal property. 18 Okla. St. § 2032. By agreeing to the Delaware Forum Provision on behalf of its property, Flotek Parent agreed to the provision on behalf of Flotek Sub, which was its property.

39

Those facts are sufficient to establish a clear and significant connection between Flotek Sub and the subject matter of the Purchase Agreement. That connection is sufficient for the forum-selection-related promise by Flotek Parent (the signatory) to bind Flotek Sub (the controlled affiliate) under the foreseeability test.

### 4. The Third Element

The third element of the *Capital Group* test asks whether the claim potentially subject to the forum selection provision arises from the non-signatory's "standing relating to" the agreement containing the forum selection provision. *See Neurvana*, 2019 WL 4464268, at *3; *Cap. Gp.*, 2004 WL 2521295, *5. In this context, the meaning attributed to the concept of standing is not self-evident, and subsequent cases have read the language as imposing a substantive limitation on the extent to which a forum selection provision can bind a non-party. In my view, that interpretation warrants reconsideration.

The *Capital Group* decision does not appear to have intended to establish a new substantive limitation on the scope of a forum selection provision. Nothing in the decision suggests a new doctrinal requirement. The court rather seems to have broken its analysis into three straightforward steps. First, it asked whether the forum selection provision was valid. Second, it asked whether there was a basis to bind a non-signatory. Third, it asked whether the claim at issue fell within the scope of the provision.

The forum selection provision in the *Capital Group* case extended to "any action or proceeding based upon or relating to this Agreement." 2004 WL 2521295, at *1 n.6. When the court reached the third element, it stated:

40

> In order for Ritter to be bound by the terms of the forum selection clause, the claims asserted must arise from the [Agreement]. They clearly do. This is a suit to enforce the [Agreement] with respect to stock held in the Trust. Therefore, the claims clearly arise from Ritter's standing relating to the [Agreement].

*Id.* at *7. Despite making passing mention of standing, the decision seems to have simply analyzed whether the claims fell within the scope of the forum selection provision. The two federal precedents cited in the *Capital Group* case likewise determined whether the non-signatory was bound by the provision, then evaluated whether the claims fell within the provision.[7]

---

[7] The *Capital Group* case relied on *Coastal Steel* and *Hadley v. Shaffer*. Only the *Hadley* decision used the language of standing, and the court did so when analyzing whether the non-signatories previously relied on their standing as intended third-party beneficiaries under a merger agreement. 2003 WL 21960406, at *5. After concluding that the non-signatories were third-party beneficiaries, the court held that they were bound by the forum selection provision in the merger agreement. *Id.* at *6. The *Coastal Steel* decision similarly held that a non-signatory that was an intended third-party beneficiary of a contract was bound by the full extent of a contractual forum selection provision in the contract. 709 F.2d at 202–03.

If one digs further, the *Hadley* court cites a federal decision in which a party to a joint venture sought to force the parent of its joint venture partner to arbitrate under the theory that the parent was a third-party beneficiary of the joint venture agreement. The court rejected this argument, stating: "*Coastal Steel*, its progeny and Delaware law make clear that a third party beneficiary will only be bound by the terms of the underlying contract where the claims asserted by that beneficiary arise from its third party beneficiary status." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 197 (3d Cir. 2001) (emphasis omitted). The decision only cited two decisions to support this assertion, neither of which involved Delaware law and neither of which seems directly on point. *See id.* (citing *Indus. Elecs. Corp. v. iPower Distrib. Gp., Inc.*, 215 F.3d 677, 680 (7th Cir. 2000), and *Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*, 85 F.3d 21, 28 (2d Cir. 1996)). The *Industrial Electronics* decision instead adhered to the rule that when a third-party beneficiary invokes the benefits of a contract, it must accept the burdens, including an arbitration provision. 215 F.3d at 680–81. The decision held that

The reference to standing in the *Capital Group* case, however, has caused other Delaware decisions to attempt to give meaning to that term. In a footnote in *Weygandt*, this court posited that the language of the *Capital Group* case meant that "the agreement containing the forum selection clause must also be the agreement that gives rise to the substantive claims brought by or against a non-signatory in order for the forum selection clause to be enforceable against the non-signatory." 2009 WL 1351808, at *4 n.15. This decision has referred to this rule as the same-agreement rule.

The *Weygandt* footnote was dictum. The third element of the *Capital Group* test was not at issue in *Weygandt* because the parties agreed that it was met. *Id.* at *4.

The fact that an observation is dictum does not mean that it is not persuasive. Here, however, the provenance of the rule provides reason to question it. Recall that the procedural posture of *Weygandt* involved a buyer bringing a counterclaim against the seller under an asset purchase agreement and a third-party claim against the seller's affiliate— the Landlord—under the Lease. The forum selection provision appeared in the purchase

---

the claims did not fall within the scope of the provision because they arose under a different agreement. *Id.* at 681. The *Spear, Leeds & Kellogg* decision likewise adhered to the rule that when a third-party beneficiary invokes the benefits of a contract, it must accept the burdens, including an arbitration provision. 85 F.3d at 26.

The concept of standing under this line of authority thus seems tied to traditional third-party beneficiary status. References to standing need not seep into other parts of the analysis. Once a court determines that a forum selection provision binds a non-signatory, the court should enforce the language of the provision.

42

agreement, but the claim against the Landlord related to the Lease. It thus does not seem likely that the claimant in *Weygandt* could have satisfied the same-agreement rule, because the agreement that contained the forum selection provision did not give rise to the claim against the Landlord. That said, it seems even less likely that the *Weygandt* court would have reached a different result if the parties had not stipulated that the third element of the *Capital Group* test was met. The court stressed the closely related nature of the purchase agreement and the Lease, and the court relied heavily on policy rationales, including the problem that unless the forum selection provision bound the Landlord, the Landlord "would have the power to cause duplicative and inefficient litigation in multiple forums and undermine the benefit of predictability that W & A's controller, Weygandt, provided to Gulfstream by agreeing to the Consent Provision in the Asset Purchase Agreement." *Id.* at \*6. The reasoning of *Weygandt* thus suggests a more flexible approach to the third element than the single-agreement rule would support.

Subsequent cases have created solutions to work around the limitations of the same-agreement rule. One line of authority, for example, extends the same-agreement rule to claims and defenses that are "inextricably intertwined" with the agreement containing for forum selection provision. *McWane, Inc. v. Lanier*, 2015 WL 399582, at \*8 (Del. Ch. Jan. 30, 2015); *see PPL Corp. v. Riverstone Hldgs. LLC*, 2019 WL 5423306, at \*7 (Del. Ch. Oct. 23, 2019).

The more serious problem with the same-agreement rule is that it overwrites the forum selection provision that the parties drafted. That becomes evident when a forum selection provision sweeps more broadly than claims that arise under the agreement

43

containing the provision. Forum selection provisions often encompass claims that arise out of or relate to an agreement, and like the Delaware Forum Provision, they may also encompass claims arising out of or relating to other transaction documents or agreements. The same-agreement rule limits the scope of these provisions so that they only apply to the non-signatory for purposes of claims that arise under the agreement containing the provision.

That outcome runs contrary to the underlying principles of estoppel that lead to the forum selection provision binding the non-signatory. When a non-signatory accepts a direct benefit under an agreement, principles of equitable estoppel demand that the non-signatory accept the burdens associated with that agreement, including a forum selection provision. Yet under the single-agreement rule, the non-signatory need not accept the full extent of those burdens. The non-signatory is obligated to accept the burdens of the forum selection provision only to the extent that claims arise under the agreement containing the provision. Principles of equitable estoppel should result in the non-signatory bearing all of the burdens associated with the agreement, including the full scope of the forum selection provision.

A similar problem arises when principles of promissory estoppel cause the forum selection provision to bind a non-signatory. The foreseeability test recognizes that a controller, such as a parent corporation, may enter into a transaction on behalf of itself and its controlled affiliates. As part of the transaction, a controller can promise to centralize litigation involving itself and its controlled affiliates in a particular forum. If a controller enters into a primary agreement that contains a forum selection provision that extends, by its terms, to closely related agreements, then the controller is promising to centralize

44

litigation involving those agreements in the chosen forum. That is true even if (i) the controller causes controlled affiliates to enter into the closely related agreements and (ii) the controlled affiliates are not parties to the primary agreement containing the forum selection provision. Using promissory estoppel to enforce the provision against the controlled affiliates "promote[s] stable and dependable trade relations" by preventing the controller from using a controlled affiliate to evade its promise. *Weygandt*, 2009 WL 1351808, at *5 (internal quotation marks omitted). The same-agreement rule, by contrast, enables the controller to evade its promise, because for purposes of a non-signatory controlled affiliate, the forum selection provision only reaches claims arising under the agreement containing the provision.

This case illustrates those difficulties. The plain language of the Delaware Forum Provision extends to any claims that arise out of or relate to the Terpene Agreement. The Purchase Agreement contains the Delaware Forum Provision, but the Purchase Agreement does not give rise to the claims in the Texas Lawsuit. The Terpene Agreement gives rise to some of the substantive claims in the Texas Lawsuit, and all of the claims in the Texas Lawsuit relate to some degree to the Terpene Agreement, but the Terpene Agreement does not contain the forum selection provision.

As this decision has explained, principles of estoppel call for enforcing the Delaware Forum Provision against Flotek Sub, and the case for invoking promissory estoppel is particularly clear. Through the Delaware Forum Provision, Flotek Parent promised to litigate all claims arising out of or relating to the Terpene Agreement in Delaware. Yet the same-agreement rule would permit Flotek Parent to escape that promise and litigate only

45

some of those claims in Delaware. Under the same-agreement rule, the Delaware Forum Provision would extend to claims against ADM for tortious interference with the Terpene Agreement, aiding and abetting a breach of fiduciary duty, and the like. But the Delaware Forum Provision would not extend to the core claims under the Terpene Agreement itself, such as Flotek Sub's claim for breach of the Terpene Agreement or its request to rescind the Terpene Agreement.

At the time of contracting, it is hard to believe that the parties sought to achieve that result. Instead, the plain language of the Purchase Agreement and the structure of the Transaction show that ADM and Flotek Parent intended for the Delaware Forum Provision to encompass all claims that arise under or relate to the Terpene Agreement, including claims for breach of the Terpene Agreement. Only a party to the Terpene Agreement, such as Flotek Sub or the Company, could assert a claim for breach of the Terpene Agreement. ADM and Flotek Parent thus necessarily foresaw and intended that the Delaware Forum Provision would encompass those claims, notwithstanding the same-agreement rule.

Whether to apply the same-agreement rule ultimately comes down to a choice among default rules, because parties always can contract for a different result. As a default, the same-agreement rule presumes that when a controller enters into a primary agreement that contains a forum selection provision encompassing claims that arise under or relate to closely related agreements, the controller only intends for the forum selection provision (i) to encompass claims that arise under or relate to the other closely related agreements to the extent the claims are asserted against signatories to the primary agreement and (ii) does not intend to bind the controller's affiliates who are the actual parties to the closely related

46

agreements. Parties can contract around the default rule and make the single forum selection provision in the primary agreement enforceable against controlled affiliates only if they ensure that every party to a subsidiary agreement is also a signatory to the primary agreement, if only for purposes of the forum selection provision. The rule does not enable a controller to agree to an overarching forum selection provision in a primary agreement that binds its non-signatory affiliates for purposes of claims under closely related agreements unless those affiliates are made parties to the agreement.

Declining to follow the single-agreement rule presumes that when a controller enters into a primary agreement that contains a forum selection provision that encompasses claims that arise under or relate to other closely related agreements, the controller intends for the forum selection provision (i) to encompass claims that arise under or relate to the other closely related agreements, even if asserted by or against the controller's affiliates and (ii) to bind the controller's affiliates who are parties to those agreements. To contract around this result, parties can simply agree to a narrower forum selection provision in the primary agreement, or they can include a specific forum selection provision in the closely related agreement. This default rule enables parties to enter into overarching forum selection provisions in a primary agreement without requiring that every controlled affiliate become a party to that agreement.

This decision adopts the latter approach. It better promotes freedom of contract by enabling a controller to enter into an overarching forum selection provision. It also avoids the problem of a court applying a default rule to overwrite agreed-upon language. It promotes simpler forum selection constructs, because a provision in a primary agreement

47

can extend to multiple agreements, avoiding the need for separate provisions in each agreement or the potentially cumbersome solution of having every controlled affiliate become a party to the primary agreement.

This decision therefore declines to apply the same-agreement rule as an overlay that limits the scope of the Delaware Forum Provision. Instead, this decision interprets the third element of the *Capital Group* test as asking whether the claims at issue fall within the plain language of the provision. This court already has conducted a claim-by-claim analysis of the causes of action in the Texas Lawsuit to determine whether they fall within the Delaware Forum Provision for purposes of an anti-suit injunction against Flotek Parent. The plain language of the Delaware Forum Provision is the same. The claims are the same. The result is the same. The Delaware Forum Provision binds Flotek Sub to the same degree as Flotek Parent.

The court emphasizes that it means no disrespect to the Texas court by issuing the anti-suit injunction. The Texas court is certainly capable of adjudicating the issues raised by this case. The Court of Chancery has a busy docket, and the judges of the court have no desire to interfere with litigation that is legitimately proceeding elsewhere. Flotek Parent, however, agreed to the Delaware Forum Provision on behalf of itself and Flotek Sub, and it would be disrespectful to a court in a sister state to permit the parties to burden that court with litigation involving claims that the parties promised to litigate in Delaware.

48

### III.     CONCLUSION

The motion for an anti-suit injunction is granted in part. Flotek Parent and Flotek Sub are enjoined from pursuing the third, fourth, fifth, eighth, and ninth causes of action in the Texas Lawsuit against ADM and the Company. Otherwise, the motion for an anti-suit injunction is denied.